BRACCO v MICHIGAN TECHNOLOGICAL UNIVERSITY

Docket No. 179661. Submitted May 19, 1998, at Sault Ste. Marie. Decided September 22, 1998, at 9:00 A.M. Leave to appeal sought.

Kenneth C. and Beverly Bracco, following the termination by Michigan Technological University of Kenneth Bracco's employment, brought an action against the university in the Houghton Circuit Court, alleging age discrimination in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*; deprivation, without due process, of a property interest in employment; and deprivation, without due process, of a liberty interest in reputation. The Braccos also brought an action against the university in the Court of Claims, alleging that employment was supposed to be terminable only for just cause and that the discharge was not supported by just cause. The actions were consolidated. A jury returned a verdict of no cause of action with regard to the age-discrimination claim. The remaining claims were tried before the bench. The court, Edward A. Quinnell, J., determined that employment was terminable only for just cause, that just cause existed for the discharge, that Kenneth Bracco was deprived of a property interest without due process, and that Kenneth Bracco was not deprived of a protectible liberty interest. The university appealed, and the Braccos cross appealed.

The Court of Appeals *held*:

1. In the absence of a civil service scheme providing that public employees employed for an indefinite term may be discharged only for just cause, public employers and employees may nonetheless create an employment relationship that is terminable only for just cause by express contract or agreement or through the employees' legitimate expectations from the employer's policies or practices. An oral contract or agreement for discharge only for just cause must be supported by evidence of negotiations about job security, by clear and unequivocal statements of job security by the employer, and by mutual assent to discharge only for just cause. A legitimate expectation of discharge only for just cause must be supported by evidence of an employer's promise that is reasonably capable of instilling in the employee a legitimate expectation that employment would be terminated only for just cause. In this case, there was no civil service scheme providing for discharge only for

just cause, the purported oral contract or agreement for discharge only for just cause was not supported by evidence of negotiations over job security, by clear and unequivocal statements of job security, or by mutual assent to discharge only for just cause, and the payment by the university of a bonus to employees who voluntarily retire early, by itself, could not give rise to a legitimate expectation of employment that was terminable only for just cause. Accordingly, Kenneth Bracco's employment was terminable at will, not terminable only for just cause, and he did not have a protectible property interest in continued employment. The trial court therefore erred in determining that employment was terminable for just cause only and that Kenneth Bracco was deprived of a property interest without due process.

2. The trial court did not clearly err in finding that the university did not damage Kenneth Bracco's reputation such that he was deprived of a liberty interest in reputation.

Affirmed in part, reversed in part, and remanded for entry of judgment of no cause of action.

1. MASTER AND SERVANT — PUBLIC EMPLOYMENT — DISCHARGE ONLY FOR JUST CAUSE.

A public employer and a public employee, in the absence of a civil service scheme providing for discharge only for just cause, may create an employment relationship that is terminable only for just cause by express contract or agreement or through the employee's legitimate expectations from the employer's policies or practices.

2. MASTER AND SERVANT — DISCHARGE ONLY FOR JUST CAUSE — ORAL CONTRACTS OR AGREEMENTS.

An oral contract or agreement for employment discharge only for just cause must be supported by negotiations over job security, by clear and unequivocal statements by the employer of job security, and by mutual assent to discharge only for just cause.

3. MASTER AND SERVANT — DISCHARGE ONLY FOR JUST CAUSE — LEGITIMATE EXPECTATIONS.

An expectation by an employee of employment discharge only for just cause must be supported by a promise by the employer that is reasonably capable of instilling in the employee a legitimate expectation that employment will be terminated only for just cause.

4. MASTER AND SERVANT — DISCHARGE ONLY FOR JUST CAUSE — LEGITIMATE EXPECTATIONS — EARLY RETIREMENT BONUSES.

An employer's payment of a bonus for early employee retirement, by itself, cannot give rise to a legitimate expectation by an employee

that employment is terminable only for just cause rather than terminable at will by either party for any reason.

*Hunter H. Watson,* for the plaintiff.

*Vercruysse Metz & Murray* (by *Robert M. Vercruysse* and *Bernice McReynolds*), for the defendant.

Before: MARKMAN, P.J., and GRIFFIN and WHITBECK, JJ.

WHITBECK, J. In 1987, defendant Michigan Technological University (MTU) terminated the employment of plaintiff Kenneth Bracco. Plaintiffs filed suit, alleging numerous counts, but, following pretrial proceedings, were left with claims of age discrimination, breach of a just-cause employment contract, and deprivation of constitutional rights with respect to Bracco and a derivative claim for loss of consortium with respect to plaintiff Beverly Bracco. A jury heard the evidence of alleged age discrimination and returned a verdict of no cause of action in favor of MTU. The parties tried the remaining contract and constitutional claims in a bench trial. The trial court found that Bracco had a "just cause" contract of employment, but that MTU had just cause for terminating Bracco. However, the trial court also found that MTU deprived Bracco of due process, to which he was entitled by virtue of his property interest in the contract of employment, and awarded plaintiffs damages, together with costs and attorney fees. The trial court found that Bracco was not deprived of a protected liberty interest in his reputation. MTU now appeals, and plaintiffs cross appeal. The key issue on appeal is whether Bracco had a "just cause" contract of employment with MTU. We find that he did not, and we reverse with respect to this issue. However, we affirm the trial court's finding that Bracco was not

deprived of a protected liberty interest in his reputation.

### I. BASIC FACTS AND PROCEDURAL HISTORY

In 1970, MTU hired Bracco as a security guard. MTU terminated Bracco in 1987 after two other employees reported that he committed a theft. These employees reported that Bracco took a few packages of packaged snacks from the display rack at the cafeteria of the student union, put the packages into his pocket, and left the area. When his supervisor confronted him with the statements of the employees, Bracco gave his own statement. Although Bracco admitted that the employees' statements were accurate and admitted the conduct, adding that it "indeed did not look good," he did not specifically admit theft. Bracco's supervisor then took the statements to an administrator.

The administrator and supervisor reviewed the statements with the acting employee-relations director, Pat Vitton. Although the precise facts are unclear, it appears that these three agreed that if the statements were true, MTU should terminate Bracco's employment. They further agreed that if termination were necessary, Bracco should be given the opportunity to resign. Vitton then met with Bracco but the testimony differs with regard to what transpired. MTU contends that Vitton confronted Bracco with the employees' statements and asked for his explanation, while Bracco contends that Vitton merely told him he could resign or be fired. It appears undisputed that Bracco responded with an apology for his conduct but provided no explanation or defense. Vitton then

told Bracco he should take time to think about the decision whether to resign.

Vitton testified that when Bracco returned later that same day, he agreed to resign; Bracco did not, however, submit a written resignation. To Vitton's astonishment, Bracco arrived at her office the next morning, asserting that he was ready to go to work. The testimony again differs, but Bracco contends that he informed Vitton that he had done nothing wrong.

Underlying Bracco's position of innocence was testimony regarding a practice that took place at MTU. Bracco testified that security guards and other uniformed officers from the area could enjoy free food at the student union after hours. MTU, however, elicited testimony that the practice ceased years before this incident.[1]

The learned trial court succinctly summarized the procedural history as follows:

> Plaintiff [Bracco] filed timely suit in the Houghton County Circuit Court and in the Court of Claims, and the matters were consolidated. The cases have experienced numerous discovery proceedings, an interlocutory trip to the Court of Appeals, the retirement of one judge and the disqualification of his successor. Three theories of potential liability survived. The Elliott-Larsen Civil Rights Act [MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*] claim (age discrimination) was tried to a Houghton County jury in March of 1992, The jury found in favor of the defendant [MTU] as to that claim.
>
> The two remaining claims are a breach of oral contract claim (*Toussaint* [*v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980)]) in the Court of

---

[1] After Bracco's termination, Vitton investigated Bracco's statements regarding this practice and found that other officers, in fact, did eat free food at the student union.

Claims and a Due Process claim (deprivation of property and deprivation of liberty) in the Houghton Circuit Court. Because of the potential relief available if a Due Process violation were found, both of these theories were presented to me sitting without a jury. The non-jury trial commenced on July 27, 1992. By agreement, all evidence received during the jury trial was considered as admitted in the non-jury phase, to the extent relevant. Because of the length of time that had passed since the earlier trial and the voluminous exhibits, I directed the parties to file post-trial briefs in lieu of closing arguments, and the parties have done so.

After the bench trial, the trial court issued detailed findings of fact and conclusions of law. Relying on *Toussaint*, the trial court concluded that "the evidence clearly and unequivocally demonstrates that plaintiff [Bracco] had a subjective expectation of job security, and that his subjective expectation was objectively reasonable and was intended by both parties." The trial court therefore concluded that Bracco had "sustained his burden of proving that he could be discharged only for just cause."

The trial court further concluded that Bracco did not commit theft, stating that "he [Bracco] had a subjectively honest belief that he had a right to eat the food under the circumstances." Nevertheless, the trial court went on to state:

However, I also conclude that, based on the facts known to them at the time of the termination, the officials of MTU responsible for it were acting in good faith, were acting reasonably (subject to the Due Process discussion to follow), and that the perceived theft amounted to just cause for discharge under standards set by MTU.

The trial court found that Bracco did not have a liberty interest in his employment, stating:

> The evidence is totally devoid of any conduct on the part of the university suggesting that the university did anything to create or enhance any stigma resulting from the termination of plaintiff's employment. The termination was mentioned in a news story carried in the campus newspaper, but that occurred only in reporting the filing of the complaint; other news organizations carried a similar news story.

However, the trial court went on to find that, given the existence of a "just cause" employment relationship between Bracco and MTU, "plaintiff's [Bracco's] entitlement is a property interest protected by the Due Process Clause, and therefore the government cannot deprive him of it without affording him appropriate due process rights." The trial court then found that MTU denied Bracco's "procedural Due Process protections in terminating him in the manner in which it did."

Accordingly, and after further briefing on damages, the trial court awarded the plaintiffs[2] substantial damages and granted their motion for attorney fees, costs, and expenses. The trial court later entered a judgment in the amount of $373,395.06 against MTU. MTU has appealed the trial court's finding that Bracco had a just-cause contract and that MTU violated Bracco's due process rights. MTU has also appealed the trial court's award of attorney fees and costs as well as the trial court's calculation of damages. Plaintiffs cross appealed, asserting that the trial court erred in rejecting Bracco's liberty interest claim, by reducing the amount of attorney fees awarded to plaintiffs, and by finding that MTU had just cause for terminating Bracco.

---

[2] Plaintiff Beverly Bracco prevailed on her loss of consortium claim.

II. STANDARD OF REVIEW

We review a trial court's findings of fact for clear error. "Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCR 2.613(C). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re Forfeiture of $19,250*, 209 Mich App 20, 29; 530 NW2d 759 (1995). Whether those facts result in the creation of a contract is an issue of law, to be reviewed de novo. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991). When a trial court incorrectly chooses, interprets, or applies the law, it commits legal error that the appellate court is bound to correct. *Fletcher v Fletcher*, 447 Mich 871, 881; 526 NW2d 889 (1994) (BRICKLEY, J., joined by CAVANAGH, C.J., and BOYLE, J.).

III. JUST-CAUSE EMPLOYMENT

A. OVERVIEW

This case stands or falls on a single proposition: that Bracco had a "just cause" contract or agreement of employment with MTU. If Bracco did not have such a contract or agreement, then we need not address the questions whether MTU discharged him for just cause or whether MTU deprived him of his property interests without the process to which he was due.

Nonetheless, the reasoning in *Cleveland Bd of Ed v Loudermill*, 470 US 532; 105 S Ct 1487; 84 L Ed 2d 494 (1985), is—even though it is a due process case

dealing with the property rights of public employees in their continued employment—particularly instructive. *Loudermill* recognizes one situation where a public employee is a "just cause" employee: when that employee is covered by a civil service scheme in which the governing law provides that such employees can be terminated only for cause. While we may have such schemes in Michigan,[3] it is clear that Bracco is not covered by one.[4] The threshold question is, therefore, whether in the absence of a civil service scheme in which the governing law provides that public employees may be terminated only for cause, public employers and public employees may create a just-cause employment relationship.

In *Engquist v Livingston Co*, 139 Mich App 280, 285; 361 NW2d 794 (1984),  citing *Bd of Regents of State Colleges v Roth*, 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972),  and *Perry v Sindermann*, 408 US 593; 92 S Ct 2694; 33 L Ed 2d 570 (1972),  this Court held:

---

[3] It is clear in Michigan, even with public employment, that if the individual in question is an employee whose employment is terminable at will, that individual has no property right in the job. *Scott v Ann Arbor*, 76 Mich App 535, 539-540; 257 NW2d 157 (1977).  See also *James v City of Burton*, 221 Mich App 130, 134; 560 NW2d 668 (1997).

[4] Const 1963, art 11, § 5 describes a "classified *state* civil service" (emphasis supplied) but specifically excludes "employees of the state institutions of higher education," such as MTU. The act creating MTU, 1885 PA 70,  MCL 390.351 *et seq.;* MSA 15.1311 *et seq.*, does not create a civil service system for MTU employees and makes no mention of termination only for cause. Indeed, subsection 2(2), MCL 390.352(2);  MSA 15.1312(2), provides that a majority of the members of the Board of Control may "appoint or remove personnel as the interests of the institution and the generally accepted principles of academic tenure permit or require." Arguably, this language can be interpreted to mean that, other than with respect to tenured academic personnel, the Board of Control of MTU can remove its employees at will.

A property right emanates from *a contract* or statute; public employment in and of itself is not a property interest automatically entitling an employee to procedural due process. [Emphasis supplied.][5]

See also *Johnson v Menominee*, 173 Mich App 690, 695-696; 434 NW2d 211 (1988). In *Meagher v Wayne State Univ*, 222 Mich App 700, 720-721; 565 NW2d 401 (1997), this Court fleshed this issue out definitively when we said:

A property right may come *from contract* or statute, but a public employee does not have a property right in continued employment when the position is held at the will of the employee's superiors and the employee has not been promised termination only for just cause. *Manning v Hazel Park*, 202 Mich App 685, 694; 509 NW2d 874 (1993). *A public employee may show a just-cause contract under ordinary contract principles (e.g., that an express agreement, oral or written, exists for just-cause employment) or under the "legitimate expectations" theory* of *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980). See *Manning* [*v Hazel Park*, 202 Mich App 685; 509 NW2d 874 (1993)] and *Thorin v Bloomfield Hills Bd of Ed*, 203 Mich App 692; 513 NW2d 230 (1994). The latter theory,

---

[5] Interestingly, in a footnote, this Court stated, "No case has yet established that *Toussaint* applies to public employees." *Engquist, supra* at 284, n 1. This issue was settled, at least for this Court, in *Manning v Hazel Park*, 202 Mich App 685; 690; 509 NW2d 874 (1993):

We believe, and now definitively hold, that a wrongful discharge claim based on *Toussaint* is applicable to public employees. We believe that our holding is supported by *Toussaint*, which relied in part on *Perry* [*supra*]. In *Perry*, the United States Supreme Court clearly approved the concept of a constitutionally protected interest in continued employment based on an implied contract where the plaintiff was employed by a state college. Such an implied contract may be based on stated employer policies and established procedure. *Toussaint, supra*, pp 617-618.

Accordingly, a wrongful discharge claim based on Toussaint is applicable to public sector employees.

in its pure form, stemmed from the Supreme Court's common-law authority to recognize enforceable obligations that arise outside the operation of normal contract principles. *Rood v General Dynamics Corp*, 444 Mich 107, 118; 507 NW2d 591 (1993). Liability is nevertheless still premised on the parties' mutual assent to be bound. Parties are free to bind themselves to whatever termination provisions they wish. *Thomas v John Deere Corp*, 205 Mich App 91; 517 NW2d 265 (1994). However, the "implied contract" theory of *Toussaint* may not be relied upon in Michigan when there is an express contract covering the same subject matter. *Scholz v Montgomery Ward & Co, Inc*, 437 Mich 83, 93; 468 NW2d 845 (1991); *Wallace v Recorder's Court*, 207 Mich App 443, 447; 525 NW2d 481 (1994). [Emphasis supplied.]

Thus, although the Michigan Supreme Court has not spoken definitively on this subject, in this Court at least, it is clear that in the absence of a civil service scheme in which the governing law provides that public employees may be terminated only for cause, public employers and public employees may nonetheless create a just-cause employment relationship. Further, in this Court at least, it is also clear that public employers and public employees may create such relationships by ordinary contractual means (i.e., through an express contract or agreement that is either oral or written) or through the "legitimate expectations" theory of *Toussaint* (i.e., outside "normal" contractual means).

### B. *TOUSSAINT* AND ITS LIMITATIONS

#### (1) THE FACTUAL BACKGROUND IN *TOUSSAINT*

As stated by Justice LEVIN, writing for the majority in *Toussaint*:

Charles Toussaint was employed in a middle management position with Blue Cross and Walter Ebling was similarly

employed by Masco. After being employed five and two years, respectively, each was discharged. They commenced actions against their former employers, claiming that the discharges violated their employment agreements which permitted discharge only for cause. A verdict of $72,835.52 was rendered for Toussaint and a verdict of $300,000 for Ebling whose discharge left him ineligible to exercise a stock option. Different panels of the Court of Appeals reversed *Toussaint* and affirmed *Ebling*.

*     *     *

These cases are not factually distinguishable. Both Toussaint and Ebling inquired regarding job security when they were hired. Toussaint testified that he was told he would be with the company "as long as I did my job". Ebling testified that he was told that if he was "doing the job" he would not be discharged. Toussaint's testimony, like Ebling's, made submissible to the jury whether there was an agreement for a contract of employment terminable only for cause.

Toussaint's case is, if anything, stronger because he was handed a manual of Blue Cross personnel policies which reinforced the oral assurance of job security. It stated that the disciplinary procedures applied to all Blue Cross employees who had completed their probationary period and that it was the "policy" of the company to release employees "for just cause only". [*Toussaint, supra* at 595, 597-598.]

### (2) THE CONTRACTUAL LEG OF *TOUSSAINT*

The Court in *Toussaint* held that a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable although the contract is not for a definite term, i.e., although the term is "indefinite." *Id.* at 598. The Court then announced two subcategories, or "legs," of this general proposition. The first leg was that of an express contract or agreement, either oral or written. With respect to this contractual leg, the

Court found that in *Toussaint*, as in *Ebling*, there was sufficient evidence of an agreement to justify submission to the jury. *Id.* The Court went on to note that the issues submitted to both juries, without objection, were whether there was an agreement to terminate employment only for good cause and whether the employee had been discharged for good cause and then stated, "In light of the jury verdicts we proceed on the basis that the contracts provided that the employee would not be discharged except for good cause." *Id.* at 610. The Court then concluded:

> Toussaint and Ebling were hired for responsible positions. *They negotiated specifically regarding job security with the persons who interviewed and hired them.* If Blue Cross or Masco had desired, they could have established a company policy of requiring prospective employees to acknowledge that they served at the will or the pleasure of the company and, thus, have avoided the misunderstandings that generated this litigation. [*Id.* at 611-612 (emphasis supplied).]

Thus, of central importance, in the circumstances where the employee asserts that there was an express contract or agreement for just-cause employment, is that the employee have "negotiated" with the prospective employee regarding job security. Of equal importance is that the employer *agree* to terminate only for cause.[6]

---

[6] See *Toussaint, supra* at 610: "We hold only that an employer's *express agreement* to terminate only for cause, or statements of company policy and procedure to that effect, can give rise to rights enforceable in contract." [Emphasis supplied.]

### (3) THE LEGITIMATE EXPECTATIONS LEG OF *TOUSSAINT*

With respect to the second leg of *Toussaint,* the Court announced a principle of sweeping generality:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation". [*Id.* at 613.]

The Court then specifically used the legitimate expectations sobriquet for its new theory:

> An employer who establishes no personnel policies instills no reasonable expectations of performance. Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer. Employees would then have no *legitimate expectation* that any particular policy will continue to remain in force. Employees could, however, *legitimately expect* that policies in force at any given time will be uniformly applied to all. If there is in effect a policy to dismiss for cause only, the employer may not depart from that policy at whim simply because he was under no obligation to institute the policy in the first place. Having announced the policy, presumably with a view to obtaining the benefit of improved employee

attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory. [*Id.* at 619 (emphasis supplied).][7]

Clearly, the Court did not base the legitimate expectations theory of *Toussaint* upon traditional contract analysis. Rather, the Court based this leg of its decision upon an apparently intuitive determination that policies and practices relating to employee discharge tend to enhance the employment relationship and encourage an " 'orderly, cooperative and loyal work force.' " *Rood v General Dynamics Corp*, 444 Mich 107, 137-138; 507 NW2d 591 (1993), quoting *Toussaint, supra* at 613. Even, however, at the outer limits of this court-made social policy, it is apparent that some analysis is required. The first step, logically, is to determine what, if anything, the employer has promised. The second step, equally logically, is to determine whether the promise, if made, is reasonably capable of instilling a legitimate expectation by employees of just-cause employment. *Rood, supra* at 138-139.

### (4) *ROWE* AND *ROOD*

To say that *Toussaint* was greeted with less than universal delight is a considerable understatement,[8]

---

[7] Justice GRIFFIN colorfully commented on this concept in *In re Certified Question, Bankey v Storer Broadcasting Co*, 432 Mich 438, 457; 443 NW2d 112 (1989), when he said that "[f]airness suggests that a discharge-for-cause policy announced with flourishes and fanfare at noonday should not be revoked by a pennywhistle trill at midnight."

[8] See Olson, *The Excuse Factory: How Employment Law is Paralyzing the American Workplace* (New York: The Free Press, 1st ed, 1997), pp 39-40:

As they say about things unprecedented, though, there's always a first time. The Michigan Supreme Court's 1980 opinion upholding

and the Court soon began to define its limits. Justice RILEY described the general malaise in *Rowe v Montgomery Ward*, 437 Mich 627, 631-632; 473 NW2d 268 (1991) (RILEY, J., joined by BRICKLEY and GRIFFIN, JJ.):

> In *Toussaint* . . . this Court joined the forefront of a nationwide experiment in which, under varying theories, courts extended job security to nonunionized employees. In the vast outpouring of ensuing cases, there are indeed situations in which employers have in reality agreed to limit managerial discretion. However, the theory remains troubling because of those instances in which application of con-

---

Toussaint's award touched off gasps of delight around legal academia and gasps of bewilderment around the personnel offices of America. Wielding novel legal arguments like a miracle Ginsu knife, the court in short order reduced the half-dozen old contract doctrines to cole slaw. "Mutuality" was unneeded: Toussaint could hold Blue Cross to a future obligation of indefinite length even though he'd made no reciprocal commitment to stay with the company. "Reliance" was also unneeded: he could invoke the handbook language without showing it had influenced his decision to join the company or any other decision of his (in fact, the book was given to him after he'd already accepted the job). Additional or special "consideration," which courts sometimes look for before they agree to enforce an unusual promise, was unneeded as well: he needn't show he'd given up anything special to explain why the company might make him a special promise of tenure. All that mattered was his claim of a "legitimate expectation" of tenure under all the circumstances.

Aware it was breaking new ground, the court went on and on for pages, and many of its pronouncements boded ill for future employers. It said jurors didn't have to content themselves with examining whether an employer acted reasonably or in good faith; instead, they could in effect substitute their own judgment about whether there was adequate cause for firing. And in a dictum with many implications for the future, it warned that an employer could expect to rely on disciplinary rules only if it had consistently enforced such rules in the past.

Other courts around the country soon followed the Michigan court's lead. By 1990 a survey found courts in at least thirty-eight states, along with federal appeals courts in at least nineteen cases, had cited *Toussaint v Blue Cross & Blue Shield of Michigan* with approval. Thousands of new lawsuits followed.

tract law is a transparent invitation to the factfinder to decide *not* what the "contract" was, but what "fairness" requires.

That courts have not been successful in unraveling the logic of the theory to produce principles that distinguish the first category of cases from the second, is not necessarily a reason to abandon the experiment. . . . But unless the theory has some relation to the reality, calling something a contract that is in no sense a contract cannot advance respect for the law. Thus, we seek a resolution which is consistent with contract law relative to the employment setting while minimizing the possibility of abuse by either party to the employment relationship.

*Rowe* involved a plaintiff who claimed that she was told that she would have a job at Montgomery Ward as long as she achieved her sales quota. *Id.* at 632. Rowe's interviewer in her preemployment interview had a somewhat different recollection:

When we hired commission salespeople, that's sort of a different type of employee than a time-card person. Their main objective, the number one thing was that they must attain their draw of a hundred and twenty-six dollars a week, *and generally, as long as they generated sales and were honest, why, they had a job at Wards*, and that's the way we used to hire our people. [*Id.* at 632-633 (emphasis supplied).]

The *Rowe* Court held that Montgomery Ward could discharge Rowe without cause. *Id.* at 636.[9] With respect to the alleged oral just-cause contract, the Court noted:

---

[9] In her concurrence with the three-justice plurality opinion, Justice BOYLE agreed that "[p]laintiff's proofs are insufficient to support the inference of a promise of termination only for just cause." *Rowe, supra* at 662.

This Court has held that contracts for permanent employment are for an indefinite period of time and are preemptively construed to provide employment at will. *Lynas v Maxwell Farms*, 279 Mich 684, 687; 273 NW 315 (1937). When contract claims rest on proofs of oral representations, the presumption provides assurance that oral contracts for an indefinite term, which fall outside the statute of frauds, will be recognized only where circumstances suggest both parties intended to be bound. The presumption may be overcome by proof of an express contract for a definite term or a provision forbidding discharge in the absence of just cause, or it may be overcome by proofs which permit a promise implied in fact of employment security, i.e. for a particular period of time or to terminate only for just cause. [*Rowe, supra* at 636-637.][10]

Citing *Goldman v Century Ins Co*, 354 Mich 528, 535; 93 NW2d 240 (1958), and *Stark v Kent Products, Inc*, 62 Mich App 546; 233 NW2d 643 (1975), the Court held that in deciding whether there was mutual assent to a just-cause provision, it should use an objective test, " 'looking to the expressed words of the parties *and their visible acts.*' " (Emphasis added.) *Rowe, supra* at 640. The Court also quoted with approval from *Carpenter v American Excelsior Co*, 650 F Supp 933, 936, n 6 (ED Mich, 1987), to the effect that any orally grounded contractual obligation for permanent employment " 'must be based on more than an expression of an optimistic hope of a long relationship."[11] *Rowe, supra* at 640 (emphasis omit-

---

[10] Justice BOYLE agreed with this part of the plurality opinion and all parts of the plurality opinion hereafter cited. *Rowe, supra* at 662 (BOYLE, J., concurring).

[11] See also Justice GRIFFIN's remarks in *Bullock v Automobile Club of Michigan*, 432 Mich 472, 517; 444 NW2d 114 (1989) (GRIFFIN, J., joined by RILEY, C.J., concurring in part and dissenting in part):

ted). The Court concluded that oral statements of job security must be "clear and unequivocal." *Id.*

The Court also rejected Rowe's contention that Montgomery Ward's "Rules of Personal Conduct" created a contract to terminate only for cause, *id.* at 645, and found that the last handbook Rowe received from Montgomery Ward clearly set forth an employment-at-will policy. *Id.* at 646. The Court found the fact that Rowe did not sign Montgomery Ward's employment-at-will disclaimers not to be determinative, stating:

> If plaintiff had a prior express contract to be discharged only for cause, her assent would be required to modify the agreement. However, there was no such prior agreement. [*Id.* at 651.]

Thus, in *Rowe*, the Court limited the contractual leg of *Toussaint* to circumstances where the oral statements of job security were clear and convincing. Under the legitimate expectations leg, the Court held that once Rowe received Montgomery Ward's May 1983 manual, which provided for employment at will, she could "no longer harbor any legitimate expectations of a discharge-for-cause policy." *Id.* at 651.

The Court sounded similar themes in *Rood v General Dynamics Corp, supra,* although this time under the baton of then Chief Justice CAVANAGH. *Rood* involved two consolidated cases and, accordingly,

---

Surely, a modicum of realism and common sense is needed. An assurance such as that alleged in the instant case simply cannot be separated from the realities of the working world. It should be recognized that "lifetime" employment contracts are extraordinary and, being so, "must be expressed in clear and unequivocal terms before a court will conclude that an employer intended to enter into such a weighty obligation." [Citation omitted.]

two plaintiffs: Joseph Schippers, who had been employed as an over-the-road truck driver by SPX Corporation and Hy-Lift, and Dr. Richard Rood who had been employed as a salaried physician by General Dynamics. *Id.* at 110, 113-114. Under the contractual leg of *Toussaint*, the *Rood* Court found that Schippers had failed to overcome the presumption of employment at will. *Id.* at 122. Rood argued that oral statements made to him, when coupled with his employer's published policies and procedures and his favorable evaluations and merit pay increases, gave rise to a just-cause employment contract implied in fact, providing that his job was secure absent a layoff, misconduct, or unacceptable performance. The *Rood* Court disagreed. *Id.* at 133-134.[12] When dealing with the legitimate expectations leg of *Toussaint*, the *Rood* Court used the two-step analysis inherent in *Toussaint*, examining first what, if anything, the employer has promised and whether the promise, if made, "is reasonably capable of instilling a legitimate expectation of just-cause employment in [its] employees." *Id.* at 138-139. The *Rood* Court then found that the employer's policies did not give Schippers a legitimate expectation of just-cause employment, *id.* at 141,[13] but that, when the written polices of Rood's employer were considered together, a reasonable juror could find that the overall employee policies could reasonably instill a legitimate expectation of just-cause

---

[12] However, the *Rood* Court did find that General Dynamics' "*written* policy statements were sufficiently clear and definite to create a jury question, regarding the existence of a just-cause employment relationship." *Rood, supra* at 110 (emphasis supplied).

[13] Notably, the *Rood* Court observed, "[a] promise of fairness, without more, is too vague to judicially enforce." *Rood, supra* at 141.

employment in the employer's management and management support personnel. *Id.* at 142-143.

## (5) CONCLUSION

It is well to remember that, as a general rule, contracts of employment for an indefinite term are terminable at will by either party. *Toussaint, supra* at 596; *Manning, supra* at 692. An employee hired under such a contract may be discharged at any time and for no reason; the employer can do so arbitrarily and capriciously. *Rood, supra* at 116; *Henry v Hosp & Health Services Credit Union,* 164 Mich App 90, 93; 416 NW2d 338 (1987); *Cockels v Int'l Business Expositions, Inc,* 159 Mich App 30, 37; 406 NW2d 465 (1987). However, the presumption of at-will employment may be overcome by proof of an express contract for a definite term or by a provision forbidding discharge without just cause. *Rood, supra* at 117; *Rowe, supra* at 636.

Under the contractual leg of *Toussaint,* if an employee "negotiates" with a prospective employer for job security, and the prospective employer agrees to terminate only for cause, they form an agreement for just-cause employment. The test for whether there was mutual assent to a just-cause provision is an objective one, looking at the express words of the parties and their visible acts. *Rowe, supra* at 640. The oral statements of job security must be clear and unequivocal. *Id.* at 645. A statement that a newly hired employee would "be there for retirement" unless "something really was wrong" ordinarily does not constitute assent to a just-cause employment con-

tract. *Rood, supra* at 122-123.[14] The courts should not lightly infer a finding of a policy of discharge only for cause. *Rood, supra* at 136-137.

Under the legitimate expectations leg of *Toussaint*, an employer may create a situation "instinct with an obligation" if that employer's personnel policies or practices lead employees to expect that they may be discharged only for just cause. In making determinations under the legitimate expectations theory, we first assess what, if anything, the employer promised and then whether the promise, if made, is reasonably capable of instilling a legitimate expectation of just-cause employment. *Rood, supra* at 138-139.

### C. BRACCO'S CLAIM OF A JUST-CAUSE CONTRACT OR AGREEMENT

Bracco claims that he satisfies the contractual leg of *Toussaint*. In essence, Bracco contends that, in 1970, John Gooch, then MTU's Director of Employee Relations, interviewed him, that job security was the subject of negotiations between him and Gooch, that he solicited and received assurances of job security from Gooch, that he specifically inquired about lay-offs and was assured that there would be none and that Gooch told him that, after probation, jobs at MTU were "lifetime jobs . . . as long as we done our job."[15]

---

[14] Similarly, in *Brocklehurst v PPG Industries, Inc*, 836 F Supp 1354, 1358-1360 (ED Mich, 1993), a company executive's statement that "[n]o one ever gets fired" was found not to be clear and unequivocal language indicating existence of an implied contract that the employee could only be discharged for just cause and, thus, was insufficient to overcome Michigan's presumption of at-will employment.

[15] In its findings and conclusions, the trial court described Bracco's circumstances and testimony as follows:

Plaintiff's circumstances in 1970 are not in dispute. He was employed by the Oldsmobile Division of General Motors as a Security Officer in Lansing. His work schedule at Olds also permit-

As noted above, in its findings and conclusions, the trial court found that Bracco had a "subjective expectation of job security" and that this subjective expectation "was objectively reasonable and was intended by both parties." Here, we pause to note that, at least in this finding, the trial court appears to have conflated the contractual leg of *Toussaint* with the legitimate expectations leg. We do note, however, that the trial court later in its findings and conclusions referred to its finding as a determination that "there was an express oral contract calling for discharge only for just cause." We therefore assume that the trial court was proceeding under the contractual leg of *Toussaint*.

In any event, Bracco's subjective expectations about the nature of his employment constitute only one side of the equation. Under *Toussaint* and its

---

ted him to work part-time as a school bus driver. He was a member of a union with contractual job security, and typical fringe benefits. He and his wife had three small children. Being initially from the Copper Country, it had been and was their desire to return to raise their family in the relative tranquillity of their childhood homes. Plaintiff had initially submitted a job application to MTU in 1966, and had periodically renewed it. In 1970 MTU decided to convert its "night watchman" operation to a 24-hour security department. Mr. Gooch called plaintiff, among others, and plaintiff duly reported for an interview with Mr. Gooch. Plaintiff was very concerned about job security; although the MTU job gave him and his family the opportunity to live in their place of preferred residence, the new job also represented a decrease in his annual earnings from nearly $17,000 to $6,500, and with a young family to support, plaintiff was understandably interested only in a job which would endure. His memory of the specifics of the Gooch interview is understandably affected by the lapse of time, but there is no doubt that he understood Mr. Gooch's representations to be that once he successfully completed his 100-day probationary period and continued to perform his work, he would have a job for the rest of his working life. His testimony on the point is clear, reasonable under the circumstances, and totally credible.

progeny, there must be *mutual* assent to a just-cause provision under an objective standard, looking at the express words of the parties and their visible acts and the oral statements of job security must be clear and unequivocal.

Clearly, then, to assess whether there was *mutual* assent to a just-cause provision expressed in clear and unequivocal oral statements of job security, Gooch's testimony is critical. With all due deference to the trial court,[16] we hold its finding of fact, based largely upon the Gooch testimony, that there was an oral contract calling for discharge only for just cause to have been clearly erroneous. As a corollary, we hold that, as a matter of law, the factual circumstances did not result in the creation of such a contract. We note at the outset that, because of the passage of time, Gooch's memory of the actual interview with Bracco was less than perfect; we make that same observation, of course, with respect to Bracco's memory of the same interview. As a result, much of Gooch's testimony is phrased in terms of what he cus-

---

[16] The trial court obviously devoted extraordinary time and energy to the preparation of its findings and conclusions and the fact that we are left with a definite and firm conviction that it was mistaken about the existence of an express just-cause employment agreement does not detract from this effort. In this regard, we note with disapproval MTU's comments in its brief alleging, on the basis of what can only be regarded as pure speculation, age and gender bias by the trial judge and referring to other, clearly extrarecord, cases in which the trial judge was involved. Such comments and references have no part in appellate advocacy and we regard them as reprehensible. If MTU felt that the trial judge was for some reason biased with regard to this case, it could have moved for his disqualification below pursuant to MCR 2.003. That is the proper way to raise a concern over alleged bias by a trial judge, not by personal attacks on the trial judge in an appellate brief. See *In re Jackson*, 199 Mich App 22, 29; 501 NW2d 182 (1993) (to raise a claim that the trial court invaded the province of the prosecution, the party should have moved for disqualification under MCR 2.003).

tomarily would have said in an interview situation, not what he actually did say to Bracco during the 1970 interview. Nevertheless, Bracco's claim of a contract or agreement calling for discharge only for just cause is primarily based, as are the trial court's findings and conclusions in this regard, on Gooch's testimony.

With this in mind, no matter how we view Gooch's testimony, we cannot find *mutual* assent to a just-cause provision, nor can we find statements of job security that are clear and unequivocal. Gooch could not recall *any* specific conversations about an employment contract. To the extent that Gooch may have expressed an optimistic hope of a long relationship, this will not suffice. *Rowe, supra* at 640. In addition, there was no indication from Gooch that Bracco actually "negotiated" at all about job security; the fact that Bracco may have raised the issue of job security does not, standing alone or even when combined with the other circumstances, constitute "negotiations." To find otherwise is to take Gooch's statements completely out of context. Further, although Gooch may have said that MTU would be "here for our lifetime," he specifically stated that he would not guarantee a prospective employee that the employee would be there for a lifetime or that as long as the employees did their jobs, they would be lifetime jobs.

Indeed, according to Gooch's testimony, the closest that he may have come to making any guarantees at all was his testimony that he may have said, "You can stay till sixty-five, if you perform satisfactorily." At most, such a statement may have created a satisfaction employment contract. An employer may terminate a satisfaction contract if it in good faith is dissat-

isfied with the employee's performance or behavior. Moreover, the employer is the sole judge of whether performance is satisfactory. *Meagher, supra* at 722-723. Here, MTU confronted Bracco with statements of other employees accusing him of theft. Without admitting theft, Bracco admitted the conduct observed by the other employees, which he agreed "did not look good." Assuming the existence of a satisfaction contract, MTU could determine that Bracco's performance, regardless of proffered extenuating circumstances, was unsatisfactory. *Id.* Gooch's statement, if indeed he made it at all, to the effect that Bracco could remain employed by MTU until age sixty-five if he performed satisfactorily, was not a sufficient basis for finding that there was a contract or agreement calling for discharge only for just cause.[17]

### D. LEGITIMATE EXPECTATIONS

Although Bracco's claims do not appear to be explicitly grounded in a legitimate expectations theory, the trial court did make findings that at least imply that the trial court was using that theory:[18]

> Other circumstances strongly suggest the inference that MTU intended that such employees could be discharged only for just cause or, if MTU had no such specific intent, that such a contract was implied in fact. Plaintiff lacks an evidentiary "smoking gun," but the following circumstances,

---

[17] MTU argues, with some vigor, that Gooch did not have the authority to bind MTU to an employment contract with Bracco. Since we hold that there was no oral contract calling for discharge only for just cause, we need not address this argument.

[18] It may well be that the trial court advanced these findings in support of a theory of an *implied* contract. (However, see the trial court's statement, *supra* at 600, that there was an *express* oral contract calling for discharge only for cause.) If so, we hold these findings to be insufficient under the contractual leg of *Toussaint* as well.

some contemporaneous with the hiring and some later, support plaintiff's position.

The trial court then cited a number of items that it believed lent credence to this theory.[19] The most important of these items relates to evidence that Bracco presented showing that MTU offered cash bonuses to certain employees if they would retire or leave employment. The trial court found that these payments were evidence of MTU's policy of just-cause employment. The trial court reasoned that if the employees were at-will, MTU would have discharged them without making any payment whatsoever and then stated:

> [B]y making such payments, the University acknowledged that the employees could not be discharged in the absence of just cause, and therefore had a property interest in their employment which the University was obligated to recognize if the University terminated their employment.

This reasoning does not reflect Michigan law and we hold it to be incorrect as a matter of law. There is simply no legal foundation for the conclusion that an employer who offers "early retirement" bonuses is an *ipso facto* just-cause employer.[20] The fact that MTU

---

[19] Specifically, the trial court cited, in addition to evidence concerning early retirement, (1) Bracco's 1966 job application, (2) a November 13, 1970, memorandum from Gooch regarding Bracco, (3) an August 24, 1970, checklist of thirty-seven topics to be covered during an employee orientation, and (4) testimony of several other employees. We find that these items do not, other than very tangentially, have, either individually or cumulatively, any particular relevance under the legitimate expectations theory (or, as noted above, under the contractual theory). None of these items speaks specifically to what, if anything, was promised or to whether the promise, if made, was reasonably capable of instilling *in Bracco* a legitimate expectation of a just-cause employment relationship.

[20] Indeed, if the trial court's reasoning can be interpreted as finding that a property interest in employment leads to a conclusion that the employee

chose, presumably for legitimate business and personnel reasons, to provide an incentive for employees to retire early cannot be used as a basis for finding a legitimate expectation of just-cause employment under the legitimate expectations leg of *Toussaint* or as a basis for a finding of a property interest in continued employment. That an employer has provided some employees with a special payment in connection with an early retirement is not evidence that the employer promised just-cause employment to other employees. *Rood, supra* at 138-139.

### IV. LIBERTY INTEREST

On cross appeal, Bracco challenges the trial court's determination that MTU did not deprive him of a protected liberty interest in reputation. In *Manning, supra* at 694-695, this Court stated:

> A person's good name, reputation, honor, and integrity are among the liberty interests protected by the Due Process Clause of the Fourteenth Amendment. *Bd of Regents of State Colleges v Roth*, 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972). Reputation may constitute a liberty interest sufficient to invoke the protection of the Due Process Clause when it is connected with a more tangible interest such as employment. *Paul v Davis*, 424 US 693; 96 S Ct 1155; 47 L Ed 2d 405 (1976). To establish a liberty interest, the employee must show conduct of the governmental employer that might seriously damage the employee's standing and associations in the community or that imposes a stigma or other disability that denies the employee the free-

---

can only be discharged for just cause, this sets the analysis in *Loudermill* exactly on its head.

dom to take advantage of other employment opportunities.[21]

Here, the trial court found that Bracco had failed to establish conduct on the part of MTU that jeopardized his liberty interest. Our review of the record convinces us that this conclusion is not clearly erroneous. MCR 2.613(C). From the record, it appears that MTU did nothing of significance to, as the trial court stated, "enhance the stigma beyond the firing itself."

### V. CONCLUSION

We reverse the trial court's decision and judgment that Bracco overcame the presumption of at-will employment. As a result, we also reverse the trial court's decision and judgment that MTU denied Bracco due process of law; Bracco had no property interest in his continued employment. We affirm the trial court's decision that MTU did not violate Bracco's liberty interest in his reputation.

Reversed in part, affirmed in part, and remanded for entry of a judgment of no cause of action in favor of MTU. We do not retain jurisdiction.

---

[21] To be understood sensibly, the last sentence of this quote must be taken to set forth the requirements for showing a governmental employer has impinged a person's liberty interest in the person's reputation.