RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0390P (6th Cir.)
File Name: 03a0390p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

DONALD MANNIX,
    *Plaintiff-Appellee,*

  *v.*

          No. 02-1001

COUNTY OF MONROE,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-71627—Julian A. Cook, Jr., District Judge.

Submitted: August 7, 2003

Decided and Filed: November 3, 2003

Before: BOGGS, Chief Circuit Judge; SILER, Circuit
Judge; and RICE, Chief District Judge.[*]

———————

## COUNSEL

**ON BRIEF:** Rosemary G. Schikora, DYKEMA GOSSETT,
Detroit, Michigan, Daniel J. Stephenson, DYKEMA

_____

[*] The Honorable Walter Herbert Rice, Chief United States District
Judge for the Southern District of Ohio, sitting by designation.

GOSSETT, Ann Arbor, Michigan, for Appellant. Leslie J.
Nearpass, Gerald J. Briskin, Shannon M. Meechan,
NEARPASS & ASSOCIATES, Temperance, Michigan, for
Appellee.

———————

## OPINION

———————

BOGGS, Chief Circuit Judge. The County of Monroe
("County") appeals the district court's denial of its motion for
judgment as a matter of law in the action for discharge
without just cause brought by its former employee, Donald
Mannix. Michigan state law presumes that employment is at
will, Mannix's employment contract expressly provided for
employment at will, and numerous County policies stated that
employment could be terminated by either party without
cause. However, Mannix claimed that he failed to receive,
read, or understand any of these statements. Instead, because
a County policy he did read set specific levels of discipline
for specific infractions, Mannix argued that he had a
legitimate expectation of just-cause employment. The court
denied the County's motions to dismiss for failure to state a
claim and for summary judgment. A jury rendered a verdict
in favor of Mannix and the district court rejected the County's
subsequent motion for judgment as a matter of law. We
reverse for several reasons.

### I

Mannix accepted an offer of employment as a network
administrator for the County contained in an October 9, 1998
letter. This letter expressly described the position as "an 'at
will' non-union position." Mannix admits reading the letter
and understanding all of its content except the term "at will,"
which was not defined in the letter. The letter recommended
that Mannix contact the County's Human Resources
Supervisor if he had any questions or concerns, but he did not

do so. Instead, Mannix accepted the offer by signing the letter and returning it to the County.

When Mannix began work, he received a copy of the Personnel Policies of Monroe County ("Personnel Policies"), first enacted in 1977 and most recently amended in 1989. The Personnel Policies indicated that "[a]pplicants are to understand that their employment with Monroe County is not for any definite term and may be terminated at any time with or without cause and without advance notice." The Personnel Policies also provided a list of twenty-three different offenses, including gambling, wasting time, parking in the wrong spot, insubordination, and theft, and the resulting discipline ranging from verbal warnings through discharge. However, the Personnel Policies contained no explicit statement that discipline could not be imposed for other infractions. Furthermore, the Personnel Policies made clear that the disciplinary "rules and regulations may be changed by the [County] Board of Commissioners by action taken in accordance with the Board's rules of procedure. Employees will be notified of such changes as they occur." In addition to the Personnel Policies, Mannix also received and signed for a copy of the County Work Rules and Regulations, most recently amended in 1997. The work rules set out three groups of offenses of declining severity. Notably, offenses in the first group were deemed to warrant immediate dismissal, in contradiction to a three-day waiting period in the Personnel Policies. Mannix admits to reading both the Personnel Policies and the work rules.

During the course of Mannix's employment with the County, the County Board of Commissioners updated its employment policies by means of posting to an internal database. Policy 101, adopted on March 23, 1999, set the procedures for such updates and stated that "[n]o person or representative of the [County, except the County Board of Commissioners] has any authority to enter into any agreement for employment for any specific period of time, or to make any agreement contrary to the provision contained herein."

Policy 423, adopted on the same day as, and pursuant to, Policy 101, was entitled "Separation from Employment" and reiterated that "[e]mployment with the [County] is not for any definite term and may be terminated at any time with or without cause and without advance notice." Policy 423 also listed specific reasons for termination, but again did not indicate that this list was exhaustive. As a County administrator later testified, both policies were posted to the database in August 1999 and "were put on the computer email system so that all employees would have access to them at any time." Mannix admits that he, as network administrator, knew about the posting of the new policies, but denies reading them.

Mannix reported to Jeffrey W. Katke, the Information Systems Director. Katke in turn reported to Charles Londo, the County's Chief Administrative Officer. While working as a network administrator, Mannix became aware of what he regarded as financial improprieties involving Katke and Londo. In particular, Mannix was concerned that a private company operated by Katke performed work for several local municipalities, and as a favor to Katke was provided with County employees to accomplish some of these tasks. On February 1, 1999, Mannix expressed his concerns about potential conflicts of interests to several County commissioners. Thereafter Mannix's relationship with Londo and Katke deteriorated. On June 25, Mannix had a private conversation with Londo in which Londo "use[d] very violent language" and "wound up telling [Mannix that] if he found out who was spreading rumors around the county that he would take them to court and sue them for everything that they had." This conversation greatly upset Mannix, who was worried not only about lawsuits but also about losing his job. The following week, Mannix began using his privileges as network administrator to monitor Londo's email correspondence with Katke, County commissioners, and others. One of the letters from Katke to Londo that Mannix obtained over the following months indicated that Katke wished to fire Mannix. Mannix printed that letter and showed

it to several County commissioners, which eventually led to Londo's discovery that Mannix had been tapping his email. On January 7, 2000, in a letter signed by Katke, the County terminated Mannix.

On April 4, 2000, Mannix filed a six-count complaint against the County, Katke, and Londo in the United States District Court for the Eastern District of Michigan. In it he claimed that he had been discharged wrongfully, that he had been discharged against public policy, that he could recover under a theory of promissory estoppel, that the defendants had intentionally inflicted emotional distress on him, that the defendants had defamed him, and that the defendants had violated the Michigan Whistleblower's Protection Act.[1] The federal court had diversity jurisdiction because Mannix was a citizen of Ohio, all defendants were either citizens of Michigan or Michigan entities, and the amount in controversy exceeded the jurisdictional amount. The defendants filed a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. The court granted the motion in part, dismissing the emotional distress, defamation, and promissory estoppel claims against all defendants and the discharge against public policy claim against the County.

The surviving claims were tried to a jury. At the close of Mannix's case, the court denied the defendants' motion for judgment as a matter of law under Fed. R. Civ. P. 50. The jury returned a verdict for Mannix on the wrongful discharge claim and for the defendants on all other claims. While the jury declared all defendants to be liable for the wrongful discharge, it imposed damages in the amount of $80,000 on

---

[1]Mannix did not raise any constitutional argument, such as those available against state employers under the Due Process Clause.

the County and no damages on Londo and Katke.[2] The court reconciled these apparent inconsistencies by entering judgment for the full amount in favor of Mannix against the County and against Mannix with respect to the other defendants. On November 13, the court denied the County's renewed motion for judgment as a matter of law. Before this court now is the County's timely appeal of the denial of this motion.

## II

The County appeals the denial of its post-verdict motion for judgment as a matter of law. "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Fed. R. Civ. P. 50(a)(1). "In federal court diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting motions for directed verdicts and judgments notwithstanding the verdict." *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1482 (6th Cir. 1991) (citing *Fitzgerald v. Great Cent. Ins. Co.*, 842 F.2d 157, 159 (6th Cir. 1988), and *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetable & Cold Storage Co.*, 709 F.2d 427, 430 n.3 (6th Cir. 1983)); *cf. Orth v. Emerson Elec. Co.*, 980 F.2d 632, 635 (10th Cir. 1992) (federal law governs standard

---

[2]The jury appeared to be confused about the legal nature of Mannix's claim. In a note to the district judge, the jury stated that "it was the lack of application of the personnel policies that [it] found in violation of the law." In general, a violation of personnel policies not contractually agreed to, even if proven and related to a discharge, is not actionable. In cases like the present one the relevant legal question is not whether the policies were abided by, but whether they created a legitimate expectation of just-cause employment.

for granting of j.n.o.v., even in diversity cases)*;Miles v. Tenn. River Pulp & Paper Co.*, 862 F.2d 1525, 1527-28 (11th Cir. 1989) (same); *John Hancock Mut. Life Ins. Co. v. Dutton*, 585 F.2d 1289, 1292 (5th Cir. 1978) (same). In Michigan courts, "[t]he standard of review for judgments notwithstanding the verdict requires review of the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 212 (Mich. 1995). "Only if the evidence so viewed fails to establish a claim as a matter of law, should a motion for judgment notwithstanding the verdict be granted." *Ibid.* Hence, we review the denial of judgment as a matter of law under a standard akin to the federal summary judgment standard.

Under Michigan law, employment contracts without "distinguishing features or provisions" are "terminable at the will of either party." *Lynas v. Maxwell Farms*, 273 N.W. 315, 316 (Mich. 1937). This rule remains the default principle. "It is black letter law in Michigan that when an employment agreement is silent regarding the type of employment relationship, at-will employment, not just-cause employment, is presumed." *Franzel v. Kerr Mfg. Co.*, 600 N.W.2d 66, 73 (Mich. Ct. App. 1999) (citing *Rowe v. Montgomery Ward & Co.*, 473 N.W.2d 268, 276 (Mich. 1991)). However, in *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980), the Michigan Supreme Court established a significant exception to this rule. *See Brocklehurst v. PPG Indus.*, 836 F. Supp. 1354, 1359 (E.D. Mich. 1993) (recognizing modification of *Lynas* by *Toussaint*). The *Toussaint* court held that "a provision of an employment contract providing that an employee shall not be discharged except for cause is legally enforceable . . . [and that] such a provision may become part of the contract either by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements." 292 N.W.2d at 885. *Toussaint* establishes two separate theories on which just-cause employment may be found. The express-contract theory "is grounded solely on contract principles relative to

the employment setting." *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591, 598 (Mich. 1993) (internal quotation marks omitted). The legitimate-expectations theory "is grounded solely on public policy considerations" and "was founded on the [Michigan Supreme] Court's common-law authority to recognize enforceable obligations that arise outside the operation of normal contract principles." *Ibid.* (internal quotation marks omitted). Such a claim, if successful, creates a contractual provision implied in law. *Lytle v. Malady*, 579 N.W.2d 906, 911 (Mich. 1998).

Mannix was discharged by the County. As the County does not here make the argument that the verdict must be overturned because it had just cause, the wrongful-discharge verdict must be affirmed unless Mannix was an at-will employee. As at-will employment is the default rule under Michigan law and there is no evidence of an express provision creating a just-cause employment relationship, the sole remaining question before this court is whether the County's statements created in Mannix a legitimate expectation of just-cause employment. *Toussaint,* 292 N.W.2d at 885.

Initially we note that Mannix entered an *express at-will* employment relationship with the County. The letter offering employment so provided and became a binding contract when Mannix accepted by signing it. Mannix replies that the question whether he understood the term "at will" as used in the contract was a jury issue. While this may have been a genuine issue, it was not a material issue. Absent circumstances not present here, Mannix was bound by the at-will language regardless of whether he knew its legal meaning. "One who signs a contract cannot seek to avoid it on the basis that he did not read it or that he supposed that it was different in its terms." *Nieves v. Bell Indus.*, 517 N.W.2d 235, 238 (Mich. Ct. App. 1994). The employee "had an obligation to seek assistance before she signed if she felt she did not understand the application." *Reid v. Sears, Roebuck*

*& Co.*, 790 F.2d 453, 461 (6th Cir. 1986) (citing *Sponseller v. Kimball*, 224 N.W. 359 (Mich. 1929)).

Mannix cites no precedent, nor have we discovered any, that an expressly at-will employment relationship may be turned into a just-cause relationship by no more than a legitimate expectation on the part of the employee. In all cases where courts have found a *Toussaint* just-cause relationship created by legitimate expectations, the initial employment contract was silent on the question of whether it could be terminated at will. The *Toussaint* court repeatedly recognized that express at-will contracts would not be affected by its holding. "Employers are most assuredly free to enter into employment contracts terminable at will without assigning cause." *Toussaint*, 292 N.W.2d at 890. "Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer or as long as his services are satisfactory to the employer." *Id.* at 891 n.24. "[N]o employer is obliged to enter into . . . a contract [requiring cause for discharge]." *Id.* at 896-97. Later courts interpreting *Toussaint* reached the same conclusion. "The 'implied contract' theory of *Toussaint* may not be relied upon in Michigan when there is an express contract covering the same subject matter." *Bracco v. Mich. Tech. Univ.*, 588 N.W.2d 467, 472 (Mich. Ct. App. 1998) (citing *Scholz v. Montgomery Ward & Co.*, 468 N.W.2d 845 (Mich. 1991), and *Wallace v. Recorder's Court*, 525 N.W.2d 481 (Mich. Ct. App. 1994)). "It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one." *Reid*, 790 F.2d at 462 (citing *Steele v. Cold Heading Co.*, 336 N.W.2d 1 (Mich. Ct. App. 1983), and *In re DeHaan's Estate*, 134 N.W. 983 (Mich. 1912)). "*Toussaint* held that employers can avoid misunderstanding over the term of employment by requiring prospective employees to acknowledge that they serve[] at the will or pleasure of the company." *Reid*, 790 F.2d at 462 (internal citations omitted). Obtaining such an acknowledgment is "all that was required to create contracts

for employment at will." *Ibid.* "When an employment contract expressly provides for employment at will, a plaintiff, by signing the contract, assents to employment at will and cannot maintain an action based on a *prior* oral agreement for just-cause employment." *Nieves*, 517 N.W.2d at 238 (emphasis added); *accord Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546, 550 (Mich. Ct. App. 1999).

Mannix counters this conclusion by contending that his receipt of the Personnel Policies constituted a novation of the employment contract. Mannix rightly notes that his employment contract did not contain an integration clause or any language indicating that it could not be modified. *Cf. Novak*, 599 N.W.2d at 550 (rejecting discharged employee's claim that defendant had orally modified the express at-will provision of the employment contract which "contained a provision requiring that modifications of the contract be in writing and be signed by a company representative"). Under these circumstances, Mannix and the County could have agreed to replace their express at-will employment contract with an express just-cause contract. However, the novation of a contract must meet the same formal requirements as a new contract. *See Univ. Leaseway Sys. v. Herrud & Co.*, 115 N.W.2d 294, 297 (Mich. 1962). Mannix does not even contend that the receipt of the Personnel Policies satisfies the general requirements of contract formation. Instead, Mannix solely argues the issue of legitimate-expectations. But, as *Toussaint* taught, legitimate expectations may *only imply* a just-cause clause in an express contract otherwise silent on the issue. Such expectations cannot themselves establish an express contract, or novate one.[3] To hold otherwise would reverse the holding not only of *Toussaint* but most of its

---

[3] *Novak* is not to the contrary, because the court there found it necessary to inquire into the contractual limitation on modification because the plaintiff argued that there had been an *express* novation by oral agreement.

progeny. Therefore, Mannix's claim can be rejected without further inquiry.

But even if Mannix's employment contract had been silent on the question whether it created an at-will relationship, there still would not have been a just-cause contract under the *Toussaint* legitimate-expectations test, because the Personnel Policies did not create any such expectations. In general, a jury can find the existence of a legitimate expectation based on the "employer's written policy statements set forth in the manual of personnel policies." *Toussaint,* 292 N.W.2d at 885. Where the plaintiff argues a legitimate-expectations theory, the trial court should only allow the case to proceed if the "policies are reasonably capable of being interpreted as promises of just-cause employment." *Rood*, 507 N.W.2d at 606; *see also Nieves*, 517 N.W.2d at 238. A "contract to discharge only for cause may not be based on 'a mere subjective expectancy.'" *Reid*, 790 F.2d at 460 (citing *Schwartz v. Mich. Sugar Co.*, 308 N.W.2d 459 (Mich. Ct. App. 1981)); *accord Nieves*, 517 N.W.2d at 238.

Here, Mannix argues that the list of specific offenses and associated levels of discipline in the Personnel Policies created a legitimate expectation of just-cause employment. *See Murphy v. Birchtree Dental*, 964 F. Supp. 245, 248 (E.D. Mich. 1997) ("Even if the policy statement does not contain an express just cause statement, it can create legitimate expectations if it sets forth disciplinary procedures and sanctions and does not retain the right to discharge at will."). However, while a "a specific list of disciplinary violations and the penalties for each along with an optional grievance procedure" may help establish a legitimate expectation of just-cause employment, *see Rood*, 507 N.W.2d at 607 (citing *Renny v. Port Huron Hosp.*, 398 N.W.2d 327 (Mich. 1986)), it is not by itself sufficient to create such an expectation. *See Rood*, 507 N.W.2d at 608 ("A nonexclusive list of common-sense rules of behavior that can lead to *disciplinary action or discharge* . . . clearly reserves the right of an employer to discharge an employee at will."); *Biggs v. Hilton*

*Hotel Corp.*, 486 N.W.2d 61, 62 (Mich. Ct. App. 1992) ("Plaintiff's reliance in this case on the disciplinary scheme established in the employment manual does not establish a promise of termination for just cause only. Nothing in the employment manual states that an employee would not be terminated except for one of the reasons listed in the disciplinary section."); *Ozuruigbo v. Ogden Martin Sys.*, 173 F.3d 429, 1999 WL 96849, at *3 (6th Cir. 1999) (table). "Neither the adoption of systematic procedures for dealing with employees nor the creation of disciplinary guidelines transforms an at-will relationship into one prohibiting discharge except for just-cause." *Mitchell v. White Castle Sys.*, 86 F.2d 1156, 1996 WL 279863, at *5 (6th Cir. 1996) (table). "If such documents were sufficient, no employer could ever establish policies informing its employees of reasons why they could be fired without creating a 'just-cause' labor force." *Ibid.*

This conclusion is strengthened by the fact that the same Personnel Policies explicitly stated that all County employment was terminable at-will by either party. *See Reid*, 790 F.2d at 460 ("[T]he listing of causes that 'may result in the termination of your employment' in the [employer's] handbook [did not] detract[] in any way from the language in the application [stating that employees agreed that employment and compensation could be terminated with or without cause at option of employer] or provide[] a reasonable basis for the conclusion that the plaintiffs were employed under a 'for cause' contract."). *See also Lytle*, 579 N.W.2d at 913 (holding "that provisions in a handbook will not create enforceable rights when the handbook expressly states that such provisions are not intended to create an employment contract" (citing *Heurtebise v. Reliable Bus. Computers*, 550 N.W.2d 243 (Mich. 1996))). Therefore, there was no legitimate expectation of just-cause employment, and hence no just-cause clause implied-in-law under *Toussaint*.

Mannix attempts to distinguish these binding precedents on the basis that the Personnel Policies failed to state that they

did not imply a just-cause employment relationship. But the Personnel Policies go further than the materials considered in our precedents. The Personnel Policies do not merely disclaim an implication of just-cause employment; they *expressly* state that employment was terminable at will. In law, no document taken as a whole can be construed to imply what it expressly disavows. Mannix also points to the fact that the Personnel Policies merely state that employment may be "terminated at any time with or without cause and without advance notice," without using the words "at will." Considering the considerable effort that Mannix expended in an attempt to demonstrate that he did not know what "at will" meant, it is difficult to see what the inclusion of that phrase would have accomplished.

Finally, even if Mannix's employment contract had not expressly created an at-will relationship and the Personnel Policies had not failed to give rise to a legitimate expectation of just-cause employment, Mannix still could not prevail because the County amended its employment policies before his discharge. "[A] company's written policy statements, which created legitimate expectations in the employee of discharge for cause only, [can] be unilaterally modified by the employer." *Rowe*, 473 N.W.2d at 277 (citing *In re Certified Question*, 443 N.W.2d 112 (Mich. 1989)). "To effectively add [the at-will] provision and bind employees to this specific just-cause disclaimer . . . , the employer needed to give reasonable notice to all affected employees." *Lytle*, 579 N.W.2d at 912.

Distribution of a new employee handbook constitutes reasonable notice, regardless of whether the affected employee actually reads it. *See Rowe*, 473 N.W.2d at 276 (holding that "that plaintiff cannot maintain an action for breach of contract on the basis of the disciplinary guidelines because the last handbook which plaintiff received clearly set forth an employment-at-will policy"). We most recently addressed the question of whether electronic posting of an

updated manual constitutes reasonable notice in *Highstone v. Westin Engineering*, 187 F.3d 548, 552-53 (6th Cir. 1999):

> During Highstone's employment Westin revised its manual . . . . The revisions to the manual were . . . published on-line . . . one month before Westin terminated Highstone. At that time, Westin sent an e-mail message to all employees advising them of the changes. Notice was also given during staff meetings, which employees often attend. . . . The record shows that Westin sent two e-mails notifying its employees of changes to the policy manual and published the manual on-line so all employees could have easy access to the manual. Westin satisfied its burden by reasonably notifying affected employees of the changes to the manual.

We reach the same conclusion here. The County revised its policies more than nine months before Mannix's termination and posted the revised version at least four months before the termination. These revised policies made clear that County employees could be terminated with or without cause or notice. These revised policies were posted on an internal database available to employees. To spread the word of the revised policies, the County held meetings between department heads and employees and put the policies on the County's email system. This was reasonable notice.

Mannix responds that he never received actual notice of the revised policies. Under the electronic distribution system, in contrast to the older hard copy distribution of revised policies, no proof of actual receipt was collected. While Mannix, as network administrator, was aware of the existence of the revised policies, he claims not to have read them. This, Mannix argues, creates a genuine issue of fact whether he received actual notice properly to be resolved by the jury and not judges. However, *actual notice* to Mannix, while arguably a genuine issue, is not material. The material issue is *reasonable notice* to the workforce in general because a

"claim based on legitimate expectations rests on the employer's promises to the work force in general rather than to an individual employee." *Nieves*, 517 N.W.2d at 238 (citing *In re Certified Question*). Uncontradicted evidence establishes that the County did provide reasonable notice, in that it undertook steps reasonably calculated to reach the affected employees. Considering the advancement and ubiquity of electronic corporate communications, we will not induce a return to older practices by imposing a paper receipt requirement.

## III

Given the express contract, the lack of legitimate expectation of just-cause employment, and the amendment to the employment policy once again disclaiming just-cause employment, "[i]t is difficult to imagine what more the defendant might have done to make it crystal clear to [the plaintiff] that . . . employees are employees 'at will' who may be discharged with or without cause." *Dell v. Montgomery Ward & Co.*, 811 F.2d 970, 974 (6th Cir. 1987). Therefore, we **REVERSE** the district court's judgment and direct the district court to **DISMISS** the underlying action.