NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0028n.06

No. 14-2520

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 15, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM CRAWFORD, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| BENZIE-LEELANAU DISTRICT HEALTH | ) | DISTRICT OF MICHIGAN |
| DEPARTMENT BOARD OF HEALTH, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

---

**BEFORE: KEITH, ROGERS, and GRIFFIN, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** Plaintiff-Appellant William Crawford ("Crawford") brought an action against Defendants-Appellees Benzie-Leelanau District Health Department Board of Health ("the Board"), various board members in their official and individual capacities,[1] and Jenifer Murray (collectively "Defendants"). Crawford alleged, among other things, that he was deprived of a property interest in his continued employment without due process. The district court entered summary judgment for Defendants after finding that Crawford was an at-will employee and thus had no legally cognizable property interest in his continued employment. Crawford appealed. For the following reasons, we **AFFIRM**.

---

[1]Those board members are: Anne Damm, David Marshall, Dr. Richard Nielsen, James A. Schaub, Marcia Stobie, and Mary Tonneberger.

## I.  BACKGROUND

Crawford began working for the Benzie-Leelanau Health Department (the "Department") in 1976 in the hourly-wage position of Sanitarian I.  In October of 1996, he was promoted to the non-salaried Environmental Health Director position.  On January 1, 1999, he was appointed to the salaried position of Health Officer.  He continued to act as the Environmental Health Director, fulfilling both roles concurrently.

Michigan law requires that all local health departments appoint a Health Officer.[2]  *See* Mich. Comp. Laws § 333.2428.  The individual acting in the role acts as the "administrative officer of the board of health and local health department . . . ."  Mich. Comp. Laws § 333.2428(2).  Crawford acknowledges that at the time that he applied for the Health Officer position, he knew that the position was statutorily-mandated.  As the only salaried position at the Department, the Health Officer position is the highest ranking executive and administrative officer at the Department.  Crawford maintained this role for thirteen years without incident.

On June 6, 2012, however, Jenifer Murray, the Department's Personal Health Director, spoke with Heidi Roper, an employee at the Department.  Murray asked Roper "what does [Crawford] do all day?"[3]  Roper replied, "do you really want to know?"  She then informed Murray that Crawford had acted inappropriately toward another employee, Vicky Kriskywicz.  Roper described Crawford as having an "obsession" and "lustful thing" for Kriskywicz, which was really "disturbing to watch."  Roper also said that Kriskywicz "was uncomfortable with it."  Murray informed Roper to put her concerns in writing.  Roper later wrote an email in which she characterized Crawford as a "pervert."

---

[2]The Health Officer is appointed by the district board of health.  Mich. Comp. Laws § 333.2428(1).

[3]There is evidence in the record suggesting that Murray was interested in the Health Officer position.

Thereafter, other employees provided letters commenting on Crawford's behavior toward Kriskywicz. The letters alleged that Crawford paid too much attention to Kriskywicz by offering her coffee, engaging her in conversation, walking her to her car, making what the employees believed to be unnecessary visits to Kriskywicz's work area, and waiting in the parking lot for Kriskywicz at the beginning or end of the workday. The employees also alleged that Crawford stared at women's chests. The employees asserted that the behavior had been going on for a year and a half; but no one had previously reported it.

Murray told the Administrative Director, Dodie Putney, about Roper's complaint. The two agreed that the Board's Personnel and Finance Committee ("PFC") should be informed immediately. Dr. Richard Nielsen and Mary Tonneberger of the PFC read the statements and directed the Department's attorney, James Young, to conduct an investigation.

On June 15, 2012, Nielsen informed Crawford of the complaint, but Nielsen failed to give Crawford any details about it. Nielson did not tell Crawford who made the complaint. Nielsen asked Crawford to sign a confidentiality agreement and informed Crawford that an investigation would be conducted. On June 18, 2012, Attorney Young interviewed six staff members. He only interviewed employees whose names Murray had provided. Young met with Crawford to discuss the complaint. Young mentioned the "chest-staring" allegation to Crawford, but elected not to ask him about other specific allegations because he observed that Crawford was visibly upset. Young also did not provide any names or details that "would make it obvious who filed the complaint." However, Young stated that "[n]evertheless, it is a small office and, as [Crawford] examines his own behavior, he will know who made the complaint."

On June 20, 2012, Young emailed Crawford, notifying him that he would prepare a summary of the interviews and submit it to the PFC. On June 22, 2012, Young presented his

summary to the Board, which noted that Crawford's behaviors "create[d] a hostile work environment on the basis of sex and violate[d] the health department's Sexual Harassment Policy." However, Young's findings stated that Crawford did not engage in "inappropriate touching," and that the "recipient of [Crawford's] behavior [did] not recall any type of conversation that had sexual innuendo . . . ."

Thereafter, Crawford met with Nielsen. Nielsen informed him that the Board would convene a special meeting on June 26, 2012 to address the complaint. Nielsen also informed him that the potential discipline could be termination. Crawford asked Nielsen if Crawford should hire an attorney. Nielsen informed Crawford that he could not advise him on whether he should retain counsel.

On June 23, 2012, Crawford called Nielsen. Crawford explained that he was preparing a written statement to present to the Board and that he was "having a difficult time figuring out how [to] defend [himself] . . . because [he didn't] know other than talking to women's chests [] what [he was] being accused of." He requested more details regarding the allegations. Nielsen told Crawford that the complaint alleged that he had directed an excessive amount of attention to one female employee. Crawford testified that at this point, if he had to "guess," he "suspected" that the female employee was Kriskywicz.

On June 26, 2012, the Board held a special meeting at which all six Board members were present. The Board received the statements collected from various employees, including one from Kriskywicz. Crawford read and submitted a two-page statement in his defense. The Board voted to terminate Crawford from his position of Health Officer and to demote him to Sanitarian. The Board noted, among other reasons, the following bases for Crawford's termination:

1.   The Health Department's Personnel Policy provides that an employee's employment may be terminated if that employee's job-related services are not satisfactory.

2.   The Health Department's Sexual Harassment Policy provides that an employee, who violates that Policy, is subject to discipline up to and including termination.

3.  William A. Crawford, as the Health Officer and executive leader of the Health Department should have been exemplary in (i) his compliance with all Health Department policies, (ii) the execution of his duties and (iii) the exercise of good judgment in his interaction with other employees.

. . . .

6.  [Crawford's] behaviors compromise his ability to be an effective leader in the future, compromise his ability to maintain the respect of those persons whom he must lead, set a bad example for other employees of the Health Department, show unacceptably poor judgment, show an inability to recognize and evaluate his own behavior in his work environment and violate the Sexual Harassment Policy of the Health Department.

. . . .

8.  These behaviors constitute job-related services that are not satisfactory to [the Board].

Crawford expressed his regret over the Board's decision and stated that he believed he "could have moved forward in a leadership position."

On July 8, 2013, Crawford filed the underlying suit.  He alleged four claims: (1) violation of due process against the Board and individual Board members in their official capacities; (2) violation of due process against the Board members and Murray in their individual capacities; (3) intentional interference with a business relationship against Murray in her individual capacity;[4] and (4) breach of contract against the Board.  Crawford argued that he had a property interest in his continued employment, based on a Personnel Policy Manual ("Manual"), which states in relevant part:

An employee may be dismissed if his/her services are not satisfactory to the Department.  Only the Health Officer has the right to decide the employee's services are not satisfactory.  Only the Health Officer, with the approval of the Board of Health, has the ability to enter into a written employment contract with an employee. The Department has adopted a "satisfaction standard" for continued

---

[4]The parties stipulated to the dismissal of this claim.

employment instead of "at will" employment, "just cause" employment or any other employment standard. No representative of the agency, regardless of title, can make an oral contract of employment for a definite time or alter the "satisfaction" employment standard.

The Manual also states: "[a]ll employment shall be without definite term unless hired subject to a grant that is limited in duration. Upon hire, such employee will be notified that employment with the Department will be limited by the term of the grant." Defendants filed a motion for summary judgment contending that Crawford did not have a constitutionally recognized property interest in his employment.

After expressing displeasure with the manner in which Crawford's reputation was tarnished, the district court granted Defendants' motion. In finding that Crawford had no property interest in his continued employment, the district court concluded that Crawford's Health Officer position was an at-will position. Additionally, the district court held that the Manual did not apply to Crawford, and therefore he could not make out a claim for breach of contract. The district court also concluded that Crawford was not a dual employee, serving as both the Health Officer and the Environmental Health Director, because he received a salary after he was appointed to the Health Officer position. Because the district court concluded that Crawford did not have a property interest in his continued employment due to his at-will status, the district court did not reach the issues of whether Crawford was afforded the requisite procedural due process, or whether Defendants were entitled to qualified immunity. Crawford filed this timely appeal.

## II. DISCUSSION

### A. Jurisdiction

The district court had jurisdiction over this case because it presented federal claims brought pursuant to 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331. The district court had

supplemental jurisdiction over the state law claims. *See* 28 U.S.C. § 1367. The district court's judgement was a final order. *Cf. Mulhall v. Ashcroft*, 287 F.3d 543, 549 (6th Cir. 2002). Crawford timely filed his notice of appeal, giving this court jurisdiction under 28 U.S.C. § 1291, which authorizes appeals from final orders of district courts.

## B. <u>Standard of Review</u>

This Court reviews the grant of a motion for summary judgment de novo. *Bailey v. Floyd Cty. Bd. of Educ. By & Through Towler*, 106 F.3d 135, 141 (6th Cir. 1997). Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where, on the basis of undisputed facts, the moving party is entitled to judgment as a matter of law. *See Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the Court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A genuine issue concerning a material fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## C. <u>Analysis</u>

Crawford raised four issues on appeal: (1) whether the district court erred by holding that he was an at-will employee; (2) whether he was entitled to procedural due process protection regarding his termination; (3) if so, whether he in fact received sufficient due process; and

(4) whether he has a viable state-law breach-of-contract action against the Defendants. However, the essence of this appeal amounts to a single controlling inquiry—whether Crawford had a constitutionally protected property interest in his continued employment. As Crawford concedes, if he does not have such an interest, "the board's decision, no matter how ill-advised, must stand." *See* Appellant Br. at 3.

### 1. Procedural Due Process Claim

The Fourteenth Amendment prohibits state actors from depriving an individual of life liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). Crawford must first show that he possessed a property interest in his continued employment before he can prevail on his due process claims against Defendants. *See Bailey*, 106 F.3d at 141.

"The existence of a property interest depends largely on state law[,]" and not every government employee has a property interest in continued employment. *Id.* "[T]o establish a protected interest" in a government position, an employee "must be able to point to some statutory or contractual right conferred by the state which supports a legitimate claim to continued employment." *Id.* "It is a settled tenet of Michigan law that employment contracts for an indefinite term produce a presumption of employment at will absent distinguishing features to the contrary." *Dolan v. Continental Airlines/Continental Exp.*, 563 N.W.2d 23, 28 (Mich. 1997). Employment "at-will" means that the employment contract is "terminable at the will of either

party for any reason or for no reason at all." *See Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 597 (Mich. 1993).

There are two different theories upon which a plaintiff may establish a property interest in continued employment under Michigan law—the "contract theory" and the "legitimate-expectations theory." *See Mannix v. Cty. of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003) (noting that "*Toussaint*[5] establishes two separate theories"); *Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 606 (Mich. 1993) (distinguishing the "legitimate expectations theory of *Toussaint*" from the "traditional contract analysis"). Crawford relies on the legitimate expectations theory.[6]

### a. Legitimate Expectations Theory

Because it is uncontested that Crawford's employment term was indefinite, the presumption of at-will employment applies. *See Dolan*, 563 N.W.2d at 28. This presumption can only be overcome under the legitimate expectations theory if the employer made a promise that is "reasonably capable of instilling a legitimate expectation of *just-cause employment*[.]" *Lytle v. Malady*, 579 N.W.2d 906, 911 (Mich. 1998) (emphasis added). Just-cause employment means the employee shall not be discharged except for cause. *Toussaint*, 292 N.W.2d at 885. "The legitimate-expectations theory is grounded solely on public policy considerations." *Mannix*, 348 F.3d at 532 (citation omitted). Crawford asserts that the Manual created a legitimate expectation of just-cause employment. His argument is unavailing for two principal reasons: (i) the Manual does not apply to Crawford's Health Officer position; and (ii) the

---

[5]*Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980).

[6]To the extent Crawford also intended to rely on the contract theory, his claim would fail because Crawford did not allege facts that "clearly and unambiguously" indicate that the Health Department intended for the Manual to form a part of his employment contract. *See Rood*, 507 N.W.2d at 606 ("[W]here an employer establishes a policy of discharge for cause" in a policy manual or handbook, "it may become part of an employment contract only when the circumstances (e.g., the language of the handbook itself, or an employer's oral statements or conduct) *clearly and unambiguously* indicate that the parties so intended.") (emphasis added).

policies in the Manual are not reasonably capable of being interpreted as promises of just-cause employment.

### (i)      The Manual does not apply to Crawford's Health Officer Position.

No reasonable interpretation of the Manual suggests it applies to Crawford's Health Officer position.  Our case of *Bailey v. Floyd County Bd. Of Educ.*, 106 F.3d 135 (6th Cir. 1997), is instructive on this point.  In *Bailey*, we held that a Head Start Director[7] could not rely on an employee manual to support just-cause employment because the manual did not apply to her.  *Id.* at 142-43.   The manual afforded Head Start employees a four-step appeals process for disciplinary issues.  *Id.* at 139.  Bailey was hired as the Head Start Director, and each year thereafter, the superintendent would issue a letter to Bailey inviting her to retain her position for the upcoming school year.  *Id.*   Bailey was eventually terminated from this position without receiving the process outlined in the manual.  *Id.*  She brought suit alleging, among other things, due process violations.  *Id.*

In analyzing the manual, we noted that the manual afforded Head Start employees the right to appeal to the Head Start Director—Bailey.  *Id.* at 143.  We reasoned that "[i]f the manual was intended to modify Bailey's employment contract, we would expect to find a provision that would give Bailey the right to appeal to someone other than herself when confronting disciplinary action."  *Id.*  In other words, we have determined that when examining employment policies, we may not read them in a manner that defies basic logic and common sense.  In *Bailey*, basic logic dictated that an employee cannot appeal to herself.  *See id.*

Like the manual in *Bailey*, the manual upon which Crawford relies contains provisions affording employees the right to appeal to the Health Officer—*i.e.*, Crawford.  The Manual goes

---

[7]"Head Start is a federally-funded program that provides educational and social services to low-income families and their children."  *Bailey*, 106 F.3d at 138.

a step further by vesting termination authority and the administration of the personnel policies solely in the Health Officer's hands. Specifically, the Manual notes that "[t]he Health Officer or in his/her absence, his/her designate shall be responsible for the administration of approved personnel policies and the development and administration of rules and procedures." Additionally, the "Termination of Service" section of the Manual notes that "*[o]nly the Health Officer* has the right to decide the employee's services are not satisfactory." R. 40-33 (emphasis added). Further, "*[o]nly the Health Officer* . . . has the ability to enter into a written employment contract with an employee." R. 40-33 (emphasis added).

The language of the Manual itself makes clear that it does not apply to Crawford with respect to his position as the Health Officer. The Manual cannot reasonably be understood as permitting Crawford to make the final determination as to whether his own services were satisfactory. It would also be impossible for Crawford to enter into a legally enforceable written contract with himself. Additionally, like in *Bailey*, "[i]f the manual was intended to modify [Crawford's] employment contract, we would expect to find a provision that would give [Crawford] the right to appeal to someone other than" himself or his designate. *See Bailey*, 106 F.3d at 143.

Crawford argues that notwithstanding the language of the Manual, the provisions of the Manual should apply to him because the Board consulted the Manual in finding that Crawford's services were not "satisfactory" before his termination. Apparently, Crawford asserts that the Board turned a blind eye to the Manual's notation that only the Health Officer can determine whether an employee's services are not satisfactory. However, this Court has made clear that a "one-time consultation" of a manual or policy for guidance does not render the manual

applicable to the plaintiff for purposes of changing the nature of the employment relationship. *See id.*

For example, in *Bailey*, the Superintendent consulted the manual in that case "for guidance" before terminating Bailey, and the Superintendent "attempted to provide Bailey with procedures analogous to those afforded to other employees prior to commencing action against her." *Id.* However, we held that this one-time consultation did "not affect our conclusion that" the manual "was not intended, and could not reasonably be understood, to affect Bailey's" employment relationship. *Id.* In other words, the mere fact that an employer gives reasons for terminating an at-will employee does not mean the employment relationship ceases to be at-will.

This same reasoning applies here. In terminating Crawford, the Board did not merely conclude that his services were unsatisfactory, but the Board did so after noting that Crawford "as the Health Officer and executive leader of the Health Department" should *set the example* for other employees in his compliance with Health Department policies. The Board noted that his unsatisfactory behavior "compromise[d] his ability to be an effective leader" and "compromise[d] his ability to maintain the respect of those persons whom he must lead."

The actions of the Board are properly viewed as a "one-time consultation" in an "attempt[] to provide" Crawford with "procedures analogous to those afforded to other employees" prior to terminating him. *See id.* This one-time consultation "is incapable of giving [Crawford] a property interest in" his position as the Health Officer. *See id.* Therefore, Crawford's argument that because the Board consulted the Manual and the Harassment Policy, the Board *de facto* made the Manual applicable to his Health Officer position is meritless.

> **(ii)** **The policies in the Manual are not reasonably capable of being interpreted as promises of just-cause employment.**

Crawford argues that even if his Health Officer position was not covered by the Manual, then his position of Environmental Health Director is covered. As a preliminary matter, the district court made the ruling that Crawford was not employed in two positions, but rather that he was only employed as the Health Officer and occasionally fulfilled the duties of the Environmental Health Director. The district court found that because Crawford received a salary for this Health Officer position, and ceased to receive an hourly wage for the Environmental Health Director position, he was employed only as the Health Officer at the time of his termination. Crawford asserts that this ruling was erroneous.

We need not decide whether this ruling was error, because the ruling does not affect the outcome of this case. Even affording Crawford the benefit of his dual employment theory, his argument fails because the polices in the Manual are not reasonably capable of being interpreted as promises of just-cause employment.

To begin with, the Manual employs a "satisfactory" standard. Under Michigan law, the "satisfactory" standard is akin to "at-will" employment. *See Toussaint*, 292 N.W.2d at 895. *Toussaint*, the seminal Michigan case recognizing the legitimate expectations theory, analogized "satisfactory" employment to "at-will" employment, and concluded that satisfactory services are not a guarantee of job security under the legitimate expectations theory. *See id.* at 891 n.24 ("Where the employer has not agreed to job security, it can protect itself by entering into a written contract which explicitly provides that the employee serves at the pleasure or at the will of the employer *or as long as his services are satisfactory to the employer*.") (emphasis added). A promise of employment only for so long as the employee's services are satisfactory "is not . . . a promise to discharge for cause or good or just cause only." *Toussaint*, 292 N.W.2d at 895; *see*

*also Mannix*, 348 F.3d at 533; *Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 278 (Mich. 1991) (noting that the Supreme Court of Michigan views an offer of employment for "so long as" the employee's services are "satisfactory" as "terminable at will").

The Manual in this cases employs this precise language—"An employee may be dismissed if his/her services are not satisfactory to the Department." While the Manual purports to reject the "at-will" standard, the Department effectively adopted what is properly viewed as the "at-will" standard by another name. While "[p]arties are free to bind themselves to whatever termination provisions they wish," *Bracco v. Mich. Tech. Univ.*, 588 N.W.2d 467, 472 (Mich. Ct. App. 1998), the parties cannot escape controlling law on the matter. Therefore, regardless of what the employer called the standard under these circumstances, the policy is readily identifiable as one that does not create the type of job security envisioned under the legitimate expectations theory of *Toussaint*. *See Toussaint*, 292 N.W.2d at 895.[8]

An application of the two-step inquiry from *Rood* does not compel a different result. "The first step in analyzing a legitimate expectations claim . . . is to determine, *what*, if anything, the employer has promised." *Rood*, 507 N.W.2d at 606. "Promises, like contracts, may be either express or implied." *Id.* "[N]ot all policy statements will rise to the level of a promise." *Id.* at 607. Naturally, the specified terms of the policy are of importance. "The more indefinite the terms, the less likely it is that a promise has been made[,]" and "if no promise is made, there is

_____

[8]Furthermore, we are not persuaded by Crawford's reliance on the Eighth Circuit case of *PaineWebber, Inc. v. Agron*, 49 F.3d 347 (8th Cir. 1995), for the proposition that where an employer agrees to arbitrate employment disputes, then "some standard of discernable cause is inherently required in this context where an arbitration panel is called on to interpret the employment relationship." 49 F.3d at 352. Michigan has not adopted this approach. *See Samples v. Botsford Gen. Hosp.*, No. 272365, 2007 WL 1610439, at *3 (Mich. Ct. App. June 5, 2007) ("[T]he adoption of a binding arbitration policy does not convert at-will employment into just-cause."); *see also Hicks v. EPI Printers, Inc.*, 702 N.W.2d 883, 888 (Mich. Ct. App. 2005) (analyzing a case in which there was "an at-will employment relationship," and "a manual with contractual terms that included mandatory arbitration").

nothing to enforce." *Id.* If it is determined that a promise was made, "the second step is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees." *Id.* "[O]nly policies and procedures reasonably related to employee termination are capable of instilling such expectations." *Id.*

The Supreme Court of Michigan has given us the following guidance:

> [I]n all claims brought under the legitimate expectations theory of *Toussaint*, the trial court should examine employer policy statements, concerning employee discharge, if any, to determine, as a threshold matter, whether such policies are reasonably capable of being interpreted as promises of just-cause employment. *If the employer policies are incapable of such interpretation, then the court should dismiss the plaintiff's complaint on defendant's motion for summary disposition.* If, however, the employer's policies relating to the employee discharge are capable of two reasonable interpretations, the issue is for the jury.

*Rood*, 507 N.W.2d at 607 (citation omitted) (emphasis added).

"In general, a jury can find the existence of a legitimate expectation based on the 'employer's written policy statements set forth in the manual of personnel policies.'" *Mannix*, 348 F.3d at 534 (quoting *Toussaint*, 292 N.W.2d at 885). "Where the plaintiff argues a legitimate-expectations theory, the trial court should *only allow the case to proceed if* the 'policies are reasonably capable of being interpreted as promises of just-cause employment.'" *Id.* (quoting *Rood*, 507 N.W.2d at 606).

Crawford's legitimate-expectations claim fails under both prongs. With respect to the first prong, the policy language does not constitute a "promise." "[A] policy to act in a particular manner as long as the employer so chooses, is grounds to defeat any claim that a recognizable promise in fact has been made." *Lytle*, 579 N.W.2d at 911. In other words, "an employer's policy to act or refrain from acting in a specified way *if* the employer chooses is not a promise at all." *Rood*, 507 N.W.2d at 607. Consequently, we have distinguished terms such as "shall" and "will," *Freeze v. City of Decherd, Tenn.*, 753 F.3d 661, 666 (6th Cir. 2014) (concluding that use

of the term "shall" creates "an obligation"), from terms such as "may," *Brown v. City of Niota, Tenn.*, 214 F.3d 718, 721-22 (6th Cir. 2000) (concluding that use of the term "may" did not create a contractual obligation under Tennessee law). "The term 'may' is permissive and suggests that there are other permissible means for terminating" an employee. *Id.*

In the instant case, the Manual reads: "An employee *may* be dismissed if his/her services are not satisfactory to the Department." R. 40-33 (emphasis added). This language is permissive, and it is insufficient to create a contractual obligation on the part of the employer. *See Brown*, 214 F.3d at 721-22. Therefore, it is not a promise. *See id.* Because there is no promise, "there is nothing to enforce." *See Rood*, 507 N.W.2d at 607.

Even assuming that the policy is a promise, the second prong of the legitimate expectations analysis is not met because the Manual expressly rejects a "just cause" policy. *See Rood*, 507 N.W.2d at 607 (noting that "the second step is to determine whether the promise is reasonably capable of instilling a legitimate expectation of just-cause employment in the employer's employees"). The Manual states that, "[t]he Department has adopted a 'satisfaction standard' for continued employment *instead of* 'at will' employment, 'just cause' employment or any other employment standard." R. 40-33 (emphasis added). Where an employer expressly disavows a "just cause" standard, no reasonable jury can interpret the policy as adopting a "just cause" standard. *Mannix*, 348 F.3d at 535 ("[N]o document taken as a whole can be construed to imply what it expressly disavows.").

Additionally, the legitimate expectations theory of *Toussaint* may not be relied upon when there is an express provision covering the subject matter in dispute. *Id.* at 533 (citing *Bracco*, 588 N.W.2d at 472). "[A]s *Toussaint* taught, legitimate expectations may *only imply* a just-cause clause in an express contract otherwise silent on the issue." *Id.* at 534. Because the

Manual has an express provision rejecting a "just cause" standard, we cannot read into the Manual an implied provision accepting a just cause standard. *See id.* Accordingly, the legitimate expectations theory cannot apply.

For the foregoing reasons, the policy is incapable of being interpreted as a just cause policy. *See id.* Accordingly, summary judgment was proper. *See Rood*, 507 N.W.2d at 607 ("If the employer policies are incapable" of "being interpreted as promises of just-cause employment[,]" then "the court should dismiss the plaintiff's complaint on defendant's motion for summary disposition.").

Relying on *Rood*, Crawford alternatively argues that the provision in dispute is subject to two reasonable interpretations and, therefore, the case must proceed to a jury. Crawford's argument evinces a misreading of *Rood*. *Rood* does not stand for the proposition that where a policy expressly rejects a just cause standard and instead purports to adopt a different standard, then the question is for the jury. The *Rood* court was unequivocal in that if the standard is incapable of being interpreted as one for "just cause," then "summary disposition" in favor of the Defendants is necessary. *Rood*, 507 N.W.2d at 607. Therefore, the "two reasonable interpretations" language from *Rood* can only mean that at least one of those reasonable interpretations is an interpretation of just-cause employment. *See id.* at 609 (noting that "if an employer elects to create policies and procedures that are reasonably capable of being interpreted as promises to refrain from discharging employees absent just cause," then the question is for the jury). Here, as articulated above, the Manual is incapable of being interpreted as a promise of just-cause employment; therefore, the question is not for the jury and summary judgment in Defendants' favor is warranted. *See Rood*, 507 N.W.2d at 607.

Lastly, Crawford argues that the Manual created a legitimate expectation of just-cause employment because it sets forth procedures by which an employee may appeal a disciplinary decision by the Board. This argument is unavailing. "Neither the adoption of systematic procedures for dealing with employees nor the creation of disciplinary guidelines transforms an at-will relationship into one prohibiting discharge except for just-cause." *Mannix*, 348 F.3d at 535 (internal quotation marks and citation omitted). "If such documents were sufficient, no employer could ever establish policies informing its employees of reasons why they could be fired without creating a 'just-cause' labor force." *Id.*

For the foregoing reasons, there was no genuine dispute as to a material fact regarding whether Crawford had a legitimate expectation of just-cause employment in either of his positions, and therefore summary judgment in favor of Defendants was proper.[9]

## 2. Breach of Contract Claim

Crawford also asserts that he has a legitimate state-law breach of contract action against Defendants. Crawford devotes a single sentence to supporting this argument: "As argued more extensively above, whether the plaintiff has a legitimate expectation of employment except for cause arises here from both the Personnel Policy Manual and the [B]oard's actions, and is therefore a jury question under *Rood*[.]" Therefore, it appears that Crawford rests the entirety of his contract claim on his due process claim. Because the Manual did not create a legitimate expectation of just-cause employment under *Rood*, Crawford's contract claim does not warrant further analysis. *Cf. United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999) (noting that we need not address "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation") (internal quotation marks omitted).

---

[9]Because we have disposed of this claim on the merits, we need not reach the defense of qualified immunity for any of the Defendants.

### III.     CONCLUSION

For the foregoing reasons, the Manual does not apply to Crawford's position of Health Officer; and even if it applied to the Environmental Health Director, it is insufficient to create a legitimate expectation of just-cause employment.  His breach of contract claim is without merit. Accordingly, we **AFFIRM** the district court's ruling in favor of Defendants.